Federal Defenders
OF NEW YORK, INC.

Southern District
52 Duane Street-10th Floor, New York, NY 10007
Tel: (212) 417-8700 Fax: (212) 571-0392

Tamara Giwa
*Executive Director and*
*Attorney-in-Chief*

*Southern District of New York*
Jennifer L. Brown
*Attorney-in-Charge*

October 16, 2026

***By Email & CM/ECF***
Honorable Gregory H. Woods
United States District Judge
Southern District of New York
500 Pearl Street
New York, NY 10007

**Re: *United States v. Meceo McEaddy***
**25 Cr. 246 (GHW)**

Dear Judge Woods,

Since his arrest last June, Meceo McEaddy has done everything possible to meaningfully atone and take responsibility for his crimes. Shortly after his presentment, Mr. McEaddy met with the U.S. Attorney's Office and honestly answered their questions about his offense. He readily admitted that he pretended to be an agent and marketing director of a prominent multimedia company in New York City, and that he did so to attract investors for various events involving high-profile venues and famous musical artists. Mr. McEaddy explained that, at the time, he rationalized his misconduct by deluding himself into believing that his behavior was ok as long as he genuinely tried to make good on the contracts. However, Mr. McEaddy readily acknowledged that this was perverse logic, which simply allowed him to ignore the reality of his law-breaking. He understands that he should have known better given his criminal record, and that he caused real harm to his investors and reputational damage to the multimedia company.

In immediately accepting responsibility for his offense and candidly answering the government's questions, Mr. McEaddy demonstrated sincere remorse. He also saved the government precious resources by waiving his right to discovery and confirming all the individuals from whom he accepted money and solicited investments. Crucially, Mr. McEaddy corroborated the money owed to these individuals, and explained how others helped him in his scheme, which gave the government a better understanding of his culpability and the scope of his crimes. In doing so, Mr. McEaddy allowed the government to focus its investigative resources elsewhere and bring a timely resolution to this case in the best interests of the public and his victims. Because of Mr. McEaddy's candor and swift acceptance of responsibility, the government accepted Mr. McEaddy's plea to a superseding

information charging class D and E felonies that dramatically reduced his maximum sentencing exposure.

The defense acknowledges that Mr. McEaddy's criminal record is an aggravating factor that tends to weigh in favor of a guidelines sentence. There is no sugarcoating the fact that Mr. McEaddy previously served time in state prison for offenses resembling those he committed here, and that he resumed fraudulent activity relatively shortly after finishing state parole, despite having gained legitimate employment through the Theatrical Teamsters Local Union.

Nevertheless, the defense respectfully submits that a downward variance to 36 months' imprisonment—12 months on Count 1 and 24 months on Count 2—is sufficient to achieve the statutory goals of sentencing, including specific deterrence, given the totality of the circumstances surrounding Mr. McEaddy's mitigating personal background, his enthusiastic and immediate acceptance of responsibility, and his medical needs, which have become much more complicated because of a terrible injury that he suffered last August. Further, given Mr. McEaddy's demonstrated employability in the theater and entertainment industries, a sentence anywhere near the statutory maximum of 84 months is not in the victims' interest, as it would unnecessarily delay and hinder Mr. McEaddy's ability to make restitution.

**Meceo McEaddy's Mitigating Personal Background**

Meceo McEaddy was born in December 1974 in Brooklyn. His father, Meceo McEaddy Jr., and his mother, Janet Holden, were never married. Mr. McEaddy maintains a very close relationship with his mother, but he has never been close to his father. In fact, although Mr. McEaddy's father lives in Brooklyn, Mr. McEaddy has met him fewer than 10 times. As far as Mr. McEaddy is concerned, he was raised exclusively by his mother and never had a father growing up.

Mr. McEaddy grew up in Manhattan at his mother's address on West 55th Street. Because his mother was a single parent, Mr. McEaddy took on a lot of responsibilities as a child. He would help his mother do everything, including grocery shopping, bill paying, and dealing with home repairs and landlords. At the time, Mr. McEaddy figured it was normal for a child to be so involved in household affairs, as he had no other comparators. However, as he got older, he began to realize the tremendous strain and pressure this put on him and how it deprived him of a normal childhood. To this day, Mr. McEaddy resents his father for putting that burden on him and his mother.

Given Mr. McEaddy's substantial family obligations, he did not have many friends growing up. "Outsiders," as his mother referred to them, were a luxury they

could not afford because there was no time for socializing. Mr. McEaddy's mother worked hard to provide for herself and her son and she expected Mr. McEaddy to pull his weight by cooking and cleaning while she was at work. Mr. McEaddy and his mother lived paycheck-to-paycheck and oftentimes did not have enough food in the house. Mr. McEaddy has terrible memories of getting up early in the morning with his mother to get in line at various food banks and churches for free or subsidized meals. Mr. McEaddy does not believe his mother ever received child support from his father, formally or informally.

When Mr. McEaddy was around 13 or 14 years old, his mother married someone named Chuck Holden. Although Mr. McEaddy did not witness Holden physically abuse against his mother, he was privy to loud arguments and shouting matches, which Mr. McEaddy believed Holden instigated to mentally control his mother. Unsurprisingly, their marriage was short lived, and they divorced when Mr. McEaddy was around 18 years old.

Mr. McEaddy's mother never abused him as a child, but she was herself a product of foster care and never had a meaningful relationship with her biological parents. As a result, Mr. McEaddy believes his mother struggled at times to understand and connect with him, as she never experienced the kind of unconditional love and support that he pined for throughout his childhood and adolescence.

Indeed, when Mr. McEaddy was 15 years old, his mother enrolled him in a military school in Wayne, Pennsylvania. That decision was difficult for Mr. McEaddy's mother, who was extremely reluctant to separate from her son. But Mr. McEaddy was struggling in school academically and behaviorally, and a change of scenery felt necessary. To her credit, Mr. McEaddy's mother consulted with him before she enrolled him in the military academy, which reflected their closeness and how much they trusted each other. Mr. McEaddy ultimately agreed that it was a good idea to move to Pennsylvania, and he approached this new experience with an open mind. While it was hard for Mr. McEaddy to adjust to being away from his mother, he returned to New York City to finish his schooling when he was 17. Mr. McEaddy continued to reside with his mother until he was about 22 years old.

Given his background, Mr. McEaddy has always struggled to make close friends and date. For two decades, he dated one woman, but the relationship never really developed. When they finally moved in together shortly after the COVID-19 pandemic began, they promptly broke up after they both realized their incompatibility. Mr. McEaddy has not had a meaningful romantic relationship since.

His criminal record notwithstanding, Mr. McEaddy has always strived to

work hard and maintain employment. Early in his adulthood, Mr. McEaddy aspired to become a police officer. Between the ages of 19 and 24, Mr. McEaddy was a voluntary auxiliary police officer with the NYPD. In that role, he accompanied NYPD officers on patrol, though he never carried a weapon or a radio. Unfortunately, Mr. McEaddy did not have enough college credits to continue pursuing a career in law enforcement. Later, in 1998, Mr. McEaddy tried to pivot to a career in security by obtaining a New York State security license. However, when he tried to pursue a career in security for hotels, he found it difficult to get a steady job because they wanted prior law enforcement experience and did not consider his auxiliary, volunteer role as sufficient. Accordingly, Mr. McEaddy let his security license lapse and he never looked back.

Around the same time that Mr. McEaddy exited the security field he was introduced to the entertainment and hospitality industry, at first as a manager of two nightclubs, Mr. Fruit's Chocolate and Mirage. These jobs facilitated Mr. McEaddy's networking in entertainment circles, ultimately culminating in his present position within the Theatrical Teamsters Local Unions 817 and 814, which provide employees to several film and television production companies in New York City. Unfortunately, in trying to build his personal brand and find job opportunities through large-scale event planning, Mr. McEaddy began lying about his connections and job titles to obtain contracts.

**The Offense Conduct and Post-Offense Rehabilitation**

It is impossible to minimize the seriousness of Mr. McEaddy's offense conduct. On the heels of successfully completing parole for state fraud offenses involving his deception of major event production companies, Mr. McEaddy pretended to be employed by a well-known multimedia corporation in New York City to solicit event-related investments from various individuals and corporate entities. At the time, Mr. McEaddy deluded himself into believing that lying about being employed by the multimedia company was ok because he genuinely intended to make good on the contracts. Of course, this was wrong, and all Mr. McEaddy did was set himself up for another criminal prosecution—this time in federal court.

Fortunately, Mr. McEaddy did not hesitate to take responsibility for his offense. Shortly after his initial appearance, Mr. McEaddy sat down with the government and effectively told on himself, truthfully answering their questions about all aspects of his scheme, which obviated the government's need to devote any additional time and resources to identifying victims and determining loss amount. Mr. McEaddy was thorough, candid, and honest—and all without the benefit of receiving discovery of any kind. Because of his efforts, the government agreed to quickly resolve Mr. McEaddy's case and allow him to plead guilty to a superseding information containing class D and E felonies punishable by no more than seven

years' imprisonment.

Throughout his time on pre-trial release, Mr. McEaddy has also demonstrated that he is amenable to court supervision and can obey the law. Except for a misunderstanding in a grocery store last August, which resulted in a shoplifting allegation that was dismissed, Mr. McEaddy has been an exemplary pre-trial releasee who enjoys a good rapport with his pre-trial officer and has maintained employment through the Theatrical Union. Of course, Mr. McEaddy's full-time employment was interrupted after he was forced into disability because of a debilitating accident in August 2025.

Specifically, on August 23, 2025, Mr. McEaddy was walking down the street, minding his own business when he was struck by a delivery driver operating a motorized scooter at a very high speed. The collision knocked Mr. McEaddy over and fractured his left tibial plateau, a serious knee injury that involved a break in the flat-top surface of Mr. McEaddy's shinbone where it meets the knee joint. Because the plateau is part of the weight-bearing surface of the knee joint, Mr. McEaddy required immediate surgery, which occurred two days later, on August 27. The surgery included placement of a temporary external fixator, which was necessary to stabilize the tibia and surrounding structures and facilitate healing. Mr. McEaddy's experience post-surgery has been nothing short of arduous.

For the first couple months after his initial surgery, Mr. McEaddy was virtually bedridden and required a walker to move. Eventually, he progressed to crutches, but still struggled with his mobility and could not work normal hours. The interference with his income also caused Mr. McEaddy to give up his apartment and move back in with his mother, which has been a challenging and embarrassing development. Mr. McEaddy's treatment remains ongoing; late last month, he returned for surgery to have the temporary external fixator removed from his left leg so that he could resume physical therapy without the implant. Now, he will continue physical rehabilitation under the care of his orthopedic surgeon, who will monitor Mr. McEaddy's progress in restrengthening the area around the fracture. Motivated to regain full mobility, Mr. McEaddy is an enthusiastic participant in physical therapy, and he has also resumed taking jobs through the Theatrical Union.

Against this backdrop, a sentence within or near the statutory maximum penalty of 84 months' imprisonment (as recommended by Probation) is far greater than necessary to adequately punish Mr. McEaddy, promote respect for the law, and specifically deter him from future crimes. Instead, a sentence of 36 months' imprisonment, followed by three years' supervised release, is sufficient, particularly given Mr. McEaddy's health needs, the financial penalties associated with his conviction, the alternatives to imprisonment available through supervised release,

and sentences imposed on other fraud defendants who have perpetrated offenses similar to, or worse than, Mr. McEaddy.

**A Sentence of 36 Months' Imprisonment is Sufficient**

As the Court is aware, "[a] sentencing judge has very wide latitude to decide the proper degree of punishment for an individual offender and a particular crime." *United States v. Cavera*, 550 F.3d 180, 188 (2d Cir. 2008) (en banc). In exercising this discretion, the Court takes as its "lodestar the parsimony clause of 18 U.S.C. § 3553(a)," which requires the Court to "'impose a sentence sufficient, but not greater than necessary, to comply with' the factors set out in 18 U.S.C. § 3553(a)(2)": "proportionality, deterrence, incapacitation, and rehabilitation." *United States v. Douglas*, 713 F.3d 694, 700 (2d Cir. 2013) (quoting *Dorvee*, 616 F.3d at 183). In determining the appropriate sentence, the Court must "make an individualized assessment based on the facts presented" and "may not presume that the Guidelines range is reasonable." *Gall v. United States*, 552 U.S. 38, 50 (2007); *see also Dorvee*, 616 F.3d at 182. In making this assessment, the Court must "consider every convicted person as an individual," and its sentence must "fit the offender and not merely the crime." *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citations omitted).

The defense appreciates that there are aggravating circumstances—namely Mr. McEaddy's record and the timing of his offense in relation to completing parole for his state fraud offense—that tend to favor a higher sentence. However, when balanced against the totality of Mr. McEaddy's circumstances, such a sentence is greater than necessary to adequately punish, incapacitate, and deter Mr. McEaddy, and would otherwise create an unwarranted sentencing disparity between him and other similarly situated defendants.

*First*, as to punishment, three years' imprisonment is a substantial sentence for anyone, but especially for Mr. McEaddy, who turns 52 this year, suffers from Type II diabetes, and continues to convalesce from a serious and debilitating left tibial fracture. 36 months in prison also adequately balances the need for some period of incarceration with the substantial financial penalties Mr. McEaddy accepted as part of his plea agreement and the other, punitive options available to the Court as part of Mr. McEaddy's supervised release. Indeed, The Second Circuit has recognized that "supervised release is itself a serious sanction that imposes significant limitations on a defendant's liberty." *United States v. Brooks*, 889 F.3d 95, 101 (2d Cir. 2018). The Supreme Court has highlighted some of these limitations in the context of probationary sentences:

> Offenders on probation are nonetheless subject to several standard conditions substantially restrict their liberty. *See United States v.*

> *Knights*, 534 U.S. 112, 119 (2001) ("Inherent in the very nature of probation is that probationers do not enjoy the absolute liberty to which every citizen is entitled." (quoting *Griffin v. Wisconsin*, 483 U.S. 868, 874 (1987)). Probationers may not leave the judicial district, move, or change jobs without notifying, and in some cases receiving permission from, their probation officer or the court. They must report regularly to their officer, permit unannounced visits to their homes, refrain from associating with any person convicted of a felony, and refrain from excess drinking. U.S.S.G. § 5B1.3. Most probationers are also subject to individual "special conditions" imposed by the court.

*Gall*, 552 U.S. at 48 (2007).

For example, as an alternative to more time in prison, the Court can impose a substantial period of home detention as part of Mr. McEaddy's three-year term of supervision. Many courts, in various procedural postures, have recognized the "obvious psychological and social impact" of home detention. *See, e.g.*, *United States v. Pennick*, 10 Cr. 191 (RJA), 2016 WL 4089192, at *8 (W.D.N.Y. Aug. 2, 2016), aff'd 713 F. App'x 33, 35 (2d Cir. 2017). This "hugely restrictive regime of confinement, compliance, intrusion and dependency" would have a dramatic mental and emotional impact on Mario. *See United States v. Coughlin*, 06 Cr. 20005 (RTD), 2008 WL 313099, at *6 (W.D. Ark. Feb. 1, 2008). And in addition to home detention, the Court can also impose a substantial community service requirement as a special condition of supervised release. *See* 18 U.S.C. §§ 3563(b)(12), 3583(d). The Office of Probation and Pretrial Services of the Administrative Office of the United States Courts has described community service as "a flexible, personalized, and humane sanction, a way for the offender to repay or restore the community. It is practical, cost-effective, and fair—a 'win-win' proposition for everyone involved." Office of Probation and Pretrial Servs., Admin. Office of the U.S. Courts, Court & Community: An Information Series About US. Probation & Pretrial Services: Community Service, at 2 (2007).[1] It recognized that "[c]ommunity service addresses the traditional sentencing goals of punishment, reparation, restitution, and rehabilitation.... It restricts offenders' personal liberty[,] … allows offenders to atone[, and] … may be regarded as … a form of symbolic restitution when the community is the victim." *Id.* In selecting candidates for community service, Probation advises that while "[n]ot every offender is a good candidate for community service … [c]ourts look for offenders with personal and social stability, who are willing, motivated, and who have no history of violence." *Id.*

*Second*, a sentence of 84 months' imprisonment is far greater than necessary to promote specific and general deterrence. Three years in federal prison followed by

[1] Available at https://www.miep.uscourts.gov/downloads/CourtCommunity.pdf.

a three-year term of supervised release enforced by home detention and community service would send a clear and unequivocal message to Mr. McEaddy that he cannot break the law ever again. This is especially true given the Court's ability to revoke and reimprison Mr. McEaddy in two-year increments without a jury trial for any violation of his release conditions. *See* 18 U.S.C. § 3583(e)(3). And as to general deterrence, there is no rational connection between the length of a defendant's sentence and general deterrence.

Social science data confirms that general deterrence is advanced by the certainty of punishment, not the severity of the sentence imposed. Put another way, data confirm that more severe sentences are not more effective at promoting general deterrence. *See* M. Tonry, Purposes and Functions of Sentencing, 34 CRIME AND JUSTICE: A REVIEW OF RESEARCH 28-29 (2006) ("[I]ncreases in severity of punishments do not yield significant (if any) marginal deterrent effects.... Three National Academy of Science panels … reached that conclusion, as has every major survey of the evidence."). There is no indication that deterrence is influenced by an increase in individual punishment. G. Kleck et al., Deterrence and Macro-Level Perceptions of Punishment Risks: Is There a "Collective Wisdom"?, 59 CRIME & DELINQUENCY 1006, 1032 (2013); *see also* A. von Hirsch et al., CRIMINAL DETERRENCE AND SENTENCE SEVERITY: AN ANALYSIS OF RECENT RESEARCH 1 (1999) (survey of criminological research find that "the studies reviewed do not provide a basis for inferring that increasing the severity of sentences generally is capable of enhancing deterrent effects"); R. Paternoster, How Much Do We Really Know about Criminal Deterrence, 100 J. CRIM. L. & CRIMINOLOGY 765, 818 (2010) (noting that there is "no real evidence of a deterrent effect for severity"). Any would-be fraudster who happens to learn of Mr. McEaddy's case will be deterred far more by the fact of his prosecution in federal court, swift, felony conviction, and substantial supervision conditions than by any increase in the severity of his sentence.

*Third*, a sentence of 84 months' imprisonment is substantially greater than sentences imposed by other courts in this district on fraud defendants who, like Mr. McEaddy, resolved their cases through negotiated pleas and a superseding information, and were convicted of similar (or worse) crimes. 18 U.S.C. § 3553(a)(6).

For example, in *United States v. Marcus Frazier*, 21 Cr. 649 (VEC), the defendant pleaded guilty to an information charging him with two counts of wire fraud under 18 U.S.C. § 1343. One count was in connection with a PPP loan fraud scheme to obtain $6.9 million in emergency government funds (resulting in a statutory maximum penalty of 60 years' imprisonment). Although a substantial amount of the funds at issue was recovered, the defendant was deemed personally accountable for $1,429,812.16 in forfeiture. In addition to the PPP loan fraud, Mr. Frazier also pleaded guilty to other bank and credit card-related fraud that he had

committed before the PPP loan fraud occurred. Judge Caproni sentenced the defendant to four years' imprisonment, followed by three years of supervised release.

In *United States v. Omar Khan*, 20 Cr. 117 (PAE), the defendant pleaded guilty to an information charging him with aggravated identity theft in satisfaction of an indictment accusing him of a large-scale, yearslong scheme to obtain money from various investors and consumers of fine wine and promising, but never delivering, returns on their purported investments in wine-related industries. The government also accused the defendant of absconding overseas to avoid prosecution and aggressively pursued his extradition to the United States. And in connection with his plea, the defendant agreed that he was responsible for no less than $7,000,000 in restitution to his victims. Judge Engelmayer sentenced the defendant to two years' imprisonment followed by a year of supervised release, in accordance with 18 U.S.C. § 1028A.

In *United States v. Joseph D'Ambrosio*, 25 Cr. 317 (PKC), the defendant was a successful investment advisor who invested, and ultimately stole, millions of dollars from his closest family and friends. Over the course of nearly two decades, he admitted to lying to his investors by providing them with false paperwork that contained misrepresentations about the value of their investments. When it became clear to the defendant that he was no longer able to keep up the scheme without getting caught, he turned himself in and negotiated a plea to investment adviser fraud under 15 U.S.C. § 80b-6 & 80b-17, which carries a statutory maximum of five years' imprisonment. In total, the defendant agreed to $6,831,865 in restitution. At sentencing, the victims demanded the maximum possible sentence, but Judge Castel imposed a below-guidelines sentence of 40 months' imprisonment, followed by three years of supervised release.

Lastly, in *United States v. Thomas Bransky*, 23 Cr. 514 (VSB), the defendant was initially charged with wire fraud and conspiracy to commit wire fraud in connection with his management of a non-profit that obtained nearly a billion dollars in New York City contracts to provide homeless shelter services. The government ultimately accepted the defendant's guilty plea to a violation of 18 U.S.C. § 371, in which the defendant agreed to $1,200,000 in forfeiture and $7,687,583.94 in restitution. Judge Broderick sentenced the defendant to six months' imprisonment, followed by three years of supervised release.

Of course, the defense appreciates that no two cases are identical and that there are features of the above-cited cases that distinguish them from Mr. McEaddy's case. But these cases illustrate that defendants in this District convicted of frauds involving substantially greater sums of money and conduct spanning many years frequently receive sentences far less than the 84 months recommended

by Probation here. Accordingly, these cases, however distinguishable, weigh in favor of the defense's requested sentence of 36 months' imprisonment.

**Conclusion**

For the reasons set forth above and for any that are apparent at the time of sentencing, the defense respectfully requests that the Court sentence Meceo McEaddy to 36 months' imprisonment followed by three years of supervised release with special conditions, including, but not limited to, home detention and community service.

Respectfully submitted,

Andrew John Dalack
Assistant Federal Defender
(212) 417-8768

Cc: AUSA William Stone