**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Jacob K. Javits Federal Building*
*26 Federal Plaza, 37th Floor*
*New York, New York 10278*

October 23, 2026

**BY ECF AND EMAIL**
The Honorable Gregory H. Woods
United States District Judge
Southern District of New York
Daniel Patrick Moynihan United States Courthouse
500 Pearl Street
New York, New York 10007

**Re: *United States v. Meceo Ray McEaddy, a/k/a "Ray Annes,"* S1 25 Cr. 246 (GHW)**

Dear Judge Woods:

The Government respectfully submits this letter in advance of the sentencing of defendant Meceo Ray McEaddy, scheduled for October 29, 2026, at 11:00 a.m. For the reasons set forth below, the Government respectfully requests that the Court impose the applicable Guidelines sentence of 84 months' imprisonment, which includes a 24-month mandatory minimum sentence, to be followed by three years of supervised release. Such a sentence would be sufficient but not greater than necessary to serve the purposes of sentencing and would adequately reflect the seriousness of the defendant's criminal conduct.

## I. Offense Conduct

For nearly six years, the defendant devised and led a scheme that stole more than $1 million from nearly two dozen victims who paid the defendant to staff, promote, and organize entertainment events throughout the country. (Pre-Sentencing Report ("PSR") ¶ 9). These events included sporting events, photoshoots, and concerts at venues operated by or associated with the victims. (*Id.*).

Throughout the offense, the defendant claimed to be a successful and experienced media agent at Sony Music Entertainment who could book high-profile venues, source popular tickets for victims, and arrange for famous artists to appear and perform at the victims' events. The defendant advertised his services on social media, including on LinkedIn, where he falsely claimed to be an agent at Sony Music. (PSR ¶ 9). A picture of a screenshot of the defendant's LinkedIn, which was shared by one of the victims, is copied below.




In truth, however, the defendant had no connection to Sony or any of the venues or artist he promised to book, and he lacked both the experience and the capacity to provide any of the services he promised to perform. Premised on the defendant's promises and his claimed role at Sony, approximately twenty victims signed contracts with the defendant for his services. Pursuant to those contracts, the victims wired the defendant approximately $1,046,375. When the defendant inevitably failed to provide the agreed-upon services, he told the victims additional lies, eventually cut off contact with many of the victims, and ultimately refused to refund most of the money he stole from the victims. The victims' events were cancelled and tickets that McEaddy promised would be acquired were never purchased. (PSR ¶ 11).

In addition, on at least two occasions, the defendant convinced two victims to send him $132,000 each as an investment in Super Bowl tickets that the defendant claimed he would buy wholesale and sell for a profit with the victims. (PSR ¶¶ 35–40). As with the musical performances, the defendant never purchased the tickets and kept most of the money for his own use. (PSR ¶ 39).

In executing this long-running scheme, the defendant worked closely with another individual ("CC-1") who helped the defendant draft a number of fraudulent documents that the defendant designed to fool the victims, including investor agreements, promotional material for fake events, and fake paystubs the defendant claimed were proof of his prior work for other media and entertainment companies. (PSR ¶ 9). As reflected in emails between the defendant and CC-1, the defendant repeatedly directed CC-1 to revise these fake marketing materials and documents so that they looked more authentic before providing them to the victims of his scheme.[1]

The defendant forged numerous letters and documents in order to trick victims into investing in his services, ultimately authoring letters and documents that he claimed came from prominent law firms and well-known artists. As one example, in October 2020, the defendant created an engagement letter for a victim on which he forged the signature of a well-known musical artist. (PSR ¶ 20). On another occasion in December 2023, and with CC-1's assistance, the defendant directed CC-1 to prepare a fake "earnings statement" claiming that the defendant was receiving a six-figure salary from another well-known entertainment company, Universal Music

[1] The defendant paid CC-1 approximately $100 on multiple occasions for these services.

Group, that he claimed to be employed by. A picture of that fraudulent earning statement, reflecting a fake address for the defendant, is copied below.

| CO. | FILE | DEPT. | CLOCK | VCHR. NO. | |
|---|---|---|---|---|---|
| VR5 | 169762 | 000435 | 118C | 0068439940 | 1 |

**Earnings Statement** ADP

UNIVERSAL MUSIC GROUP
1735 BROADWAY
NEW YORK, NY 10019

Period Beginning: 12/09/2023
Period Ending: 12/15/2023
Pay Date: 12/22/2023

Taxable Filing Status: Single/Married Separately
Exemptions/Allowances: Tax Override:
Federal: 0
State: 0
Local: 0
Social Security Number: XXX-XX-XXXX

RAY ANNES
221 RIVER STREET 9TH FLOOR
HOBOKEN, NJ 07030

| Earnings | rate | hours | this period | year to date |
|---|---|---|---|---|
| Regular | | Salary | 4,405.77 | 220,288.46 |
| Overtime | | | | |
| Gross Pay | | | $4,405.77 | 220,288.46 |
| **Deductions** | **Statutory** | | | |
| | Federal Income Tax | | -917.54 | 45,877.00 |
| | Social Security | | -191.01 | 9,550.50 |
| | Medicare Tax | | -68.92 | 3,446.00 |
| | State Tax | | -256.09 | 11,988.00 |
| | Net Pay | | $2,972.21 | |
| | Check | | -$2,972.21 | |
| | Net Check | | $0.00 | |

Your federal taxable wages this period are $4,405.77
* Excluded from Federal taxable wages
The accrued hours on your Sick Plan may not be available until your 90th day of employment

**Other Benefits And Information**

**Important Notes**

**Additional Tax Withholding Imformation**
Taxable Filing Status:
Exemptions/Allowances: Tax Override:
Federal: 0
State: 0
Local: 0

In a third example, the defendant forged a letter on behalf of a prominent attorney at an international law firm claiming to have purchased a series of Super Bowl tickets from the defendant for nearly half a million dollars. (PSR ¶ 40). In total, the defendant stole over $1 million from his various victims, the majority of which he kept and spent on himself.

## II. Criminal History

The defendant has six prior convictions, including, as relevant here, a conviction for virtually identical conduct for which the defendant previously served approximately 47 months in prison. (*Id.* ¶¶ 61–66).

In 2005, the defendant was arrested and charged for pretending to be a law enforcement officer, a ruse he used to collect money for himself that he claimed was for a homeless shelter. On or about September 7, 2005, the defendant was convicted and sentenced to six months' imprisonment. (PSR ¶ 61).

On or about November 15, 2010, the defendant pled guilty in New York County Criminal Court to reckless endangerment in the second degree and was sentenced to ninety days' imprisonment. (PSR ¶ 62).

On or about July 29, 2014, the defendant was convicted of two counts of grand larceny in the second degree, thirteen counts of grand larceny in the third degree, two counts of scheming to defraud in the first degree, two counts of criminal tax fraud in the second and fifth degrees, and one count of resisting arrest. (PSR ¶ 63). Notably, the defendant's 2014 conviction concerned

nearly identical misconduct, where the defendant collected money from victims premised on the claim that he could book prominent musical artists to perform at events. For that offense, the defendant was sentenced to an aggregate term of 5 to 10 years' imprisonment, which was subsequently reduced to 4 to 8 years' imprisonment. The defendant ultimately served approximately four years and was released on July 7, 2017, just months before he commenced the instant offense. (PSR ¶ 63).

On or about January 17, 2025, the defendant pled guilty in Queens County Criminal Court to disorderly conduct and was sentenced on or about January 17, 2025, to seven days' imprisonment. (PSR ¶ 66).

## III. Procedural History

On or about May 29, 2025, a grand jury sitting in this district returned Indictment 25 Cr. 246 (GHW) (the "Indictment"), charging the defendant in Count One with conspiracy to commit wire fraud, in violation of 18 U.S.C. § 1349, and Count Two with wire fraud, in violation of 18 U.S.C. §§ 1343 and 2. (Dkt. 3).

On or about November 6, 2025, the defendant waived indictment and pled guilty pursuant to a plea agreement dated October 31, 2025 (the "Plea Agreement"), to Superseding Information S1 25 Cr. 246 (GHW) (the "Information"), which charged the defendant in Count One with conspiracy to defraud the United States, in violation of 18 U.S.C. § 371, and Count Two with aggravated identity theft, in violation of 18 U.S.C. §§ 1028A(a)(1), 1028A(b), and 2. (Dkt. 15).

## IV. The Applicable Guidelines Range

In the Plea Agreement, the parties stipulated that the United States Sentencing Guidelines ("Guidelines") range is 75 to 87 months' imprisonment, with a mandatory minimum of 24 months' imprisonment, which must be served consecutively to any other sentence imposed, based on an Offense Level of 23 and a Criminal History Category of II. (Plea Agreement at 3–5). The Probation Office agrees with the parties' offense level calculation but calculated the defendant's criminal history as Category IV. (PSR ¶¶ 59, 67, 115). Nonetheless, the Probation Office correctly concluded that, pursuant to U.S.S.G. § 5G1.2(b), the Guidelines range on Count One is the statutory maximum term of imprisonment of 60 months because that is lower than the Guidelines range that would otherwise apply at Offense Level 23 and Criminal History Category IV. (PSR ¶ 115). As such, the applicable Guidelines sentence on Count One is 60 months' imprisonment. (*Id.*) Because Count Two requires a mandatory consecutive 24-month sentence, the applicable Guidelines sentence is 84 months' imprisonment. (PSR ¶ 115).

## V. Applicable Law

Although the Supreme Court has held that the United States Sentencing Guidelines are not mandatory, district courts are still required to "consult" the Guidelines and "take them into account" when determining a sentence. *United States v. Booker*, 543 U.S. 220, 264 (2005). As the Supreme Court has explained, "a district court should begin all sentencing proceedings by

correctly calculating the applicable Guidelines range"—that "should be the starting point and the initial benchmark." *Gall v. United States*, 552 U.S. 38, 49 (2007).

After making that initial calculation, a sentencing judge must consider the seven factors outlined in 18 U.S.C. 3553(a): (i) "the nature and circumstances of the offense and the history and characteristics of the defendant," *id.* § 3553(a)(1); (ii) the four legitimate purposes of sentencing, *see id.* § 3553(a)(2); (iii) "the kinds of sentences available," *id.* § 3553(a)(3); (iv) the Guidelines range itself, *see id.* § 3553(a)(4); (v) any relevant policy statement by the United States Sentencing Commission, *see id.* § 3553(a)(5); (vi) "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and (vii) "the need to provide restitution to any victims," *id.* § 3553(a)(7).

In determining the appropriate sentence, the statute directs courts to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, which are:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
(B) to afford adequate deterrence to criminal conduct;
(C) to protect the public from further crimes of the defendant; and
(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

*Id.* § 3553(a)(2).

## VI. The Section 3553(a) Factors Strongly Support a Guidelines Sentence of 84 Months' Imprisonment

The defendant's lengthy history of fraudulent conduct, including his role in a virtually identical fraud for which he has already served a lengthy prison term, points to the need for a substantial term of imprisonment. In light of the nature and circumstances of the instant offense, the Government agrees with Probation that a Guidelines sentence of 84 months' imprisonment (60 months on Count One followed by a consecutive term of 24 months on Count Two) followed by three years' supervised release is sufficient, but not greater than necessary, to achieve the purposes of sentencing in this case.

*First*, a Guidelines sentence of 84 months' imprisonment is warranted given the seriousness of the defendant's criminal conduct. Here, the defendant committed fraud day in and day out for nearly six years, during which he repeatedly lied to victims, created forged documents out of wholecloth, and brazenly claimed to represent billion-dollar entertainment companies. These lies successfully deceived over a dozen victims into paying the defendant over $1 million. The defendant exploited the victims' trust and, in at least one instance, his own prior personal relationship with two victims for his own significant personal gain and greed. In addition, the defendant took elaborate steps to perpetrate this fraud, forging partnership agreements, fake letters, and phony employment records in order to deceive the victims. When the victims demanded that the defendant return their money, he not only stopped responding to them and kept their money, but he also became more brazen. The largest wire transfers that the defendant appears to have

received through false representations were two of the final wire transfers uncovered by the Government's investigation. In those two instances, victims transferred approximately $132,000 apiece to the defendant for a tranche of Super Bowl tickets that the defendant purported to have had an agreement with another buyer to purchase at a higher price. The defendant's brazen and escalating criminal conduct merits a significant sentence.

*Second*, a substantial sentence is also necessary to afford adequate specific and general deterrence and to protect the public from the defendant. The defendant's previous terms of imprisonment, which included a sentence in 2014 of 60 to 100 months' imprisonment (the "2014 Sentence") (*see* PSR ¶¶ 63–65), have been inadequate to deter him. The 2014 Sentence was, in part, for a scheme that was similar to the scheme the defendant carried out here. There, as here, the defendant fraudulently induced victims to pay for concerts by musical artists to which the defendant had no access and no ability to book. (PSR ¶ 63). Despite being sentenced to a lengthy term of imprisonment, that sentence was not enough to deter the defendant from resuming his criminal conduct within months of his release. Even beyond his 2014 conviction, the defendant's long history of criminal conduct makes clear that his actions were not momentary lapses in judgment. They are part of a pattern of behavior that shows a clear disregard for the well-being of others and the rule of law. The conduct underlying the defendant's first criminal conviction is especially telling—he impersonated a police officer and solicited donations for a purported homeless shelter. (PSR ¶ 61). The defendant served his time for that sentence, but he was released, and he escalated his conduct. The defendant continued his fraudulent behavior, was caught again, served his time, and upon his release, he again returned like clockwork to engaging in fraudulent behavior, as charged here. A serious sentence is necessary to hammer home for this defendant that his actions are wrong, to protect others from becoming victims of the defendant's schemes, and to promote respect for the law that the defendant clearly lacks.

Given the proximity of the defendant's instant criminal conduct to his release from his last conviction, the Court should impose a sentence that is significantly greater than the defendant's previous sentence for a fraud-based offense (*i.e.*, 60 to 100 months' imprisonment). Given that the defendant's Guidelines (and statutory maximum) sentence is 84 months, such a sentence is warranted here. Indeed, incremental punishment—that increasingly long sentences are an appropriate way to provide specific deterrence to criminals—comports with common sense. And, in fact, the Second Circuit routinely affirms sentences based, in part, on that principle. *See, e.g.*, *United States v. Mishoe*, 241 F.3d 214, 220 (2d Cir. 2001) ("Obviously, a major reason for imposing an especially long sentence upon those who have committed prior offenses is to achieve a deterrent effect that the prior punishments failed to achieve."); *United States v. Guzman*, No. 21-441, 2022 WL 1409583, at *2–3 (2d Cir. May 3, 2022) (affirming above-Guidelines sentence imposed, in part, to provide incremental punishment and, thus, specific deterrence, and collecting cases in which Second Circuit has affirmed district courts' reliance on similar logic in imposing sentences).

A substantial sentence also conveys to other would-be perpetrators who might want to exploit others in this way that such conduct will lead to grave consequences. Indeed, defendants who engage in long-term frauds are rational actors who typically attempt to think through the costs and benefits of their criminal conduct. The cost-benefit calculus must be such that that white collar criminals are deterred from committing such crimes, even after taking into account the chances

that their crimes may evade detection altogether, and the only way to do that is by imposition of serious sentences. *See, e.g.*, *United States v. Johnson*, 16 Cr. 457-1 (NGG), 2018 WL 1997975, at *5 (E.D.N.Y. Apr. 27, 2018) ("The need for general deterrence is particularly acute in the context of white-collar crime."); *United States v. Peppel*, 707 F.3d 627, 637 (6th Cir. 2013) ("Because economic and fraud-based crimes are more rational, cool, and calculated than sudden crimes of passion or opportunity, these crimes are prime candidates for general deterrence."); *United States v. Stein*, No. 09-CR-377, 2010 WL 678122, at *3 (E.D.N.Y. Feb. 25, 2010) ("Persons who commit white-collar crimes like defendant's are capable of calculating the costs and benefits of their illegal activities relative to the severity of the punishments that may be imposed."); *United States v. Heffernan*, 43 F.3d 1144, 1149 (7th Cir. 1994) ("Considerations of (general) deterrence argue for punishing more heavily those offenses that either are lucrative or are difficult to detect and punish, since both attributes go to increase the expected benefits of a crime and hence the punishment required to deter it."); Francesco, Galbiati & Vertova, *The Deterrent Effects of Prison: Evidence From a Natural Experiment*, 117 J. of Political Econ. 257, 278 (2009) ("Our findings provide credible evidence that a one-month increase in expected punishment lowers the probability of committing a crime. This corroborates the theory of general deterrence."). The Second Circuit emphasized the importance of general deterrence in a fraud case in which the Court remanded for resentencing, finding that the district court insufficiently weighed the importance of general deterrence. *See Watts v. United States*, No. 21-2925, 2023 WL 2910634, at *4 (2d Cir. Apr. 12, 2023) ("We have said . . . that consideration of general deterrence is especially important in the crimes of the sort that this case involves."). Here, imposing a substantial term of imprisonment will send a clear message that defrauding other people, no matter who you are, will result in significant punishment.

*Third*, the mitigating factors raised in the defendant's submission plainly do not warrant a sentence of 36-months imprisonment, which is a fraction of the sentence he received for his prior fraud conviction, and a sentence that is itself well below the applicable Guidelines. The defendant's lack of a close relationship with either of his parents and his absence of close friendships cannot justify his decision to deliberately target and defraud others over a six-year period. Nor do his injuries from last August warrant any reduced sentence. And, as the defendant acknowledges, his acceptance of responsibility and his cooperation with law enforcement after his arrest resulted in a plea offer that provided a capped maximum sentence, in addition to a shorter mandatory minimum. The Court should similarly reject the defendant's request for a reduced period of supervised release after he serves his term of imprisonment, which he argues is additional punishment. (Def. Mem. at 7.) The defendant's history of recidivism makes supervision all but essential and will help to ensure that the defendant actively seeks and maintains gainful, lawful employment and leads a law-abiding life.

*Fourth*, none of the cases cited by the defendant in support of a below-Guidelines sentence is apt and, in some ways, point to the need for a *higher* sentence in this case. Unlike McEaddy, none of the defendants in the cases cited by the defendant at pages 8 and 9 of his submission had any prior criminal history. Here, McEaddy has six prior convictions, several of which are for fraudulent conduct. In addition, the defendant in *United States v. Omar Khan*, 20 Cr. 117 (PAE) pled guilty to an information that charged him only with aggravated identity theft, which has a mandatory two-year sentence, so Judge Engelmayer had no discretion to impose a higher sentence. Also, the defendant's claim that in *United States v. Joseph D'Ambrosio*, 25 Cr. 317 (PKC) "the

victims demanded the maximum possible sentence, but Judge Castel imposed a below-[G]uidelines sentence of 40 months' imprisonment" (Def. Mem. at 9), ignores the fact that the Government actually asked for a below-Guidelines sentence of 36 months' imprisonment. (*See* 25 Cr. 317 (PKC) Dkt. 29 at 1). Not only did D'Ambrosio receive a sentence that was higher than what the Government requested in that case, the extent of his acceptance of responsibility far exceeds anything the defendant has demonstrated here. Indeed, as the Government acknowledged in that case, D'Ambrosio "brought his crimes to the attention of law enforcement before anyone knew about them." (*Id.* at 5). Also, D'Ambrosio asked to "prepay restitution," which, the Government pointed out, was "an unusual ask that again should redound to [the defendant's] benefit and his full acceptance of responsibility." (*Id.*). To be sure, McEaddy did admit to his crimes without receiving discovery, and he did proffer with the Government, but there is a meaningful difference in how one behaves *after* having been caught, as opposed to voluntarily ceasing one's criminal conduct and turning oneself in *prior to* being arrested. Accordingly, rather than supporting a lower sentence, the comparison to D'Ambrosio militates in favor of imposing the Guidelines sentence recommended by the Government and the Probation Office. In sum, the requested sentence would not result in unwarranted sentencing disparities among similarly situated defendants.

## VII. Conclusion

For the reasons stated above, the Government respectfully requests that the Court impose a Guidelines sentence of 84 months' imprisonment, as such a sentence would be sufficient but not greater than necessary to serve the goals of sentencing under Section 3553(a).

Respectfully submitted,

JAMES M. MCDONALD
United States Attorney

By: ______________________________
William K. Stone
Assistant United States Attorney
Tel: (212) 637-2521

cc: Andrew Dalack, Esq. (by ECF and Email)